## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MATTHEW LONG,

    Plaintiff,

        v.

NASCO HEALTHCARE, INC.,

    Defendant.

No. 21-cv-02320

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Plaintiff Matthew Long ("Plaintiff") filed this lawsuit against his previous employer, Defendant Nasco Healthcare, Inc. ("Defendant"). Plaintiff brings claims under the Illinois Wage Payment and Collection Act and for breach of contract because Defendant allegedly failed to pay Plaintiff his total commissions earned. Defendant moves for summary judgment (Dkt. 42) on all Counts. For the following reasons, Defendant's motion is granted.

## I.     BACKGROUND

Defendant is the resulting entity of a merger between Simulaids, Inc. ("Simulaids") and Nasco Healthcare, Inc. (sometimes referred to as "Fort") that occurred January 7, 2021. (Dkt. 54 ¶ 1.) Plaintiff is a former employee of Defendant, having worked for Simulaids from 2017 until just after the merger, resigning in January 2021. (*Id.* ¶¶ 12, 67–68.)

Simulaids and Fort manufactured similar healthcare products, including trading tools for use in hospitals, medical schools, and other settings. (*Id.* ¶¶ 2–3.) These tools included body part models and other non-interactive training aids ("Station Trainers.") (*Id.* ¶ 3.) Only Simulaids manufactured and sold sophisticated training mannequins ("High-Fidelity Mannikins [sic]"), including ALEX, SmartStat, BodyInteract, and Sims VS, which are designed to "interact with the trainee, mimicking patient symptoms to make the training more realistic." (*Id.* ¶¶ 4–5.)

Simulaids hired Plaintiff as a full-time, at-will employee coinciding with the company's release of a new High-Fidelity Mannikin, ALEX. (*Id.* ¶¶ 12, 15.) Because dealers and distributors were not allowed to sell ALEX, Simulaids created the new position of territory manager. (*Id.* ¶¶ 16–17.) As territory manager, Plaintiff's job responsibilities included "generating sales revenue, representing the company at conferences, customer relations and management, and quoting prices to customers." (*Id.* ¶¶ 13, 16.) Plaintiff's territory included Illinois, Indiana, Iowa, Minnesota, Wisconsin, Missouri, Arkansas, North Dakota, South Dakota, Idaho, Wyoming, Washington, Oregon, Montana, and Nevada. (*Id.* ¶ 14.)

Despite manufacturing similar products and having the same parent company, Simulaids and Fort maintained separate corporate identities and operations, and each company had their own employees such that Plaintiff "was never an employee of, nor compensated, by [Fort]." (*Id.* ¶ 18.) For instance, Plaintiff's offer letter stated, "[i]t is with great pleasure that Simulaids offers you the position of Territory Manager." (Dkt. 44-1 at 78.)

Simulaids and Fort also operated through different Enterprise Resource Planning (ERP) systems—Simulaids through "MAPCIS" or "INFOR" and Fort through "P-8"—which recorded and tracked sales and business data. (Dkt. 54 ¶¶ 7–8.) These systems were incompatible with each other. (*Id.* ¶ 9.) Following the merger of Simulaids and Fort, Defendant consolidated all of its operations under the MAPICS ERP system. (*Id.* ¶ 11.)

Plaintiff, however, was responsible for selling products made by both Simulaids and Fort. (*Id.* at 18.) With respect to the companies' sales channels before the merger, Simulaids and Fort sold their products through Direct Sales, Sales to Distributors, International Sales, and OEM Sales. (*Id.* ¶¶ 19–23.) Direct Sales included products sold directly to end-users, including hospitals, EMTs, fire departments, and medical schools. (*Id.* ¶ 19.) Simulaids and Fort sold their products to dealers and distributors at significant discounts such that the dealers and distributors would then sell these products to their customers at higher prices. (Sales to Distributors). (*Id.* ¶¶ 20–21.) The two companies also participated in intercompany sales by selling and furnishing products to one another, and both companies sold products internationally (International Sales) and to other manufacturers (OEM Sales). (*Id.* ¶¶ 10, 22.) In terms of purchasing products, clients could order Simulaids and Fort products through sales representatives, catalogues, the internet, and customer service call-ins. (*Id.* ¶ 23.)

This lawsuit concerns the details of Plaintiff's commission structure. Plaintiff alleges his commission plan entitled him to "4% commission on ALEX (high fidelity

mannequins [sic]) sales, 4% commission on Smart Stat sales, 2% commission on dealer and distributor growth on a yearly basis and 2% commission on all direct sales into Long's territory." (Dkt. 57 ¶ 7.) Plaintiff is claiming Defendant owes him unpaid commissions of approximately $100,938 on all Fort Direct Sales, $162,288 on Sales to Distributors, $18,969 on Sales to Distributors and International, OEM, Intercompany Sales, and $13,296 on Simulaids Direct Sales. (Dkt. 54 ¶ 72.) Plaintiff also alleges that Defendant owes him unpaid bonuses for which Plaintiff would have qualified had he been properly paid his commissions. (*Id.* ¶ 73.)

Plaintiff's offer letter stated that his salary included $68,000 "plus commission as discussed." (*Id.* ¶ 25.) Plaintiff had discussions regarding his commission structure before his first day of employment with his direct supervisor, Jack McNeff. (*Id.* ¶¶ 24, 27.) That said, Plaintiff never executed an employment or commission contract with Simulaids. (*Id.* ¶ 26.) When Plaintiff had questions related to Simulaids or his commission structure, McNeff was Plaintiff's first point of contact. (*Id.* ¶¶ 28–29.) For questions about sales and commissions relating to Fort products, Plaintiff spoke with other employees, including Melissa Dummer and Kelly Jacobson. (*Id.* ¶ 28.)

Plaintiff filed this action on April 29, 2021. (Dkt. 1.) Count I of the Complaint alleges that, by failing to pay Plaintiff his owed commissions, Defendant violated the Illinois Wage Payment and Collection Act. 820 ILCS 115/1 *et seq.*; (*Id.* ¶¶ 22–27.) Count II alleges Defendant breached an employment contract, made between Plaintiff and Defendant, by failing to pay Plaintiff the total commissions due. (*Id.* ¶¶ 28–37.) Defendant now moves for summary judgment on all counts. (Dkt. 42.) In the

alternative, Defendant requests partial summary judgment on one or more specific commission categories. (*Id.* at 1–3.)

## II.  LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.  DISCUSSION

This case boils down to issues of contract interpretation. It is undisputed that the parties did not execute a written employment or compensation agreement. (Dkt. 54 ¶ 25–26.) Plaintiff's offer letter instead reflected that his compensation would include a base salary of $68,000 "plus commission as discussed." (*Id.* ¶ 25.) Plaintiff contends that the conversations he had with certain Defendant employees regarding his commission structure created an oral contract. (*Id.* ¶ 26.) Defendant disputes not the existence of the oral contract but the commissions provided for under the contract.

To resolve contractual ambiguity, and to interpret parties' intent, an Illinois court may admit parol evidence or evidence of the parties' course of performance.

*Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 891 (N.D. Ill. 2001). Specifically, "course of performance may be used to interpret the intent of the parties, since such evidence likely reflects the parties' understanding of their agreement." *Id.*

### A. Azevedo's Declaration and Expert Report.

Plaintiff produced two Excel spreadsheets ("Disputed Sales Lists") which identify "every sale on which Long claims to be owed a commission." (Dkt. 54 ¶ 70.) The first spreadsheet contains sales from the beginning of Plaintiff's employment through the third quarter of 2020, and the second spreadsheet contains sales made from the fourth quarter of 2020 through Plaintiff's resignation. (*Id.*) The Disputed Sales List contains detailed information, including: "the product sold; the state to which it shipped; whether the sale was ordered from Simulaids or [Fort]; whether it was a Direct, Distributor, or another type of Sale; and the sale price." (*Id.* ¶ 71.)

After receiving these lists, Defendant's expert, Hugo Azevedo (President of Nasco), analyzed the lists and determined that Plaintiff claims:

> (1) $162,359 in allegedly unpaid commissions on Sales to Distributors;
> (2) $100,938 in allegedly unpaid commissions on *all* Nasco Direct;
> (3) $19,935 in allegedly unpaid commissions on Sales to Distributors and International, OEM, and Intercompany Sales; and
> (4) $13,296 in allegedly unpaid commissions on miscellaneous Simulaids Direct Sales.

(*Id.* ¶ 72.)

Plaintiff disputes Azevedo's analysis but does not offer a reason, nor provide contrary evidence, as to why he disputes the analysis. (*Id.*) Defendant argues that, because Plaintiff "fails to present any contradicting evidence," the Court should deem

the analysis undisputed. (Dkt. 56 at 3 (citing *Sensky v. Sybase, Inc.*, 588 F.3d 501, 503 n.1 (7th Cir. 2009) ("[C]haracteriz[ing] facts as disputed without citing evidence that directly contradicts [moving party's] assertions . . . is insufficient to demonstrate a genuine fact dispute, and where [the nonmoving party] has responded improperly, we deem admitted the cited fact.").).)

Plaintiff also claims that Defendant's use of Azevedo's Declaration is prohibited such that the Declaration "must be stricken." (Dkt. 54 ¶ 72.) Plaintiff offers three arguments for why the Court must disregard Azevedo's Declaration and Expert Report. (Dkt. 52 at 11–12.)

Plaintiff contends that the Declaration must be disregarded because it was disclosed after the entry of a Second Amended Scheduling order. (*Id.* at 11.) But the Second Amended Scheduling Order provided that Defendant's expert reports were due on October 29, 2022, and Azevedo's expert report was disclosed by that deadline (on October 28, 2022). (Dkt. 25; Dkt. 57 ¶ 36.)

Plaintiff also argues that the Declaration must be disregarded because Defendant did not disclose Azevedo as a fact witness in its Rule 26(a)(1) disclosures. (Dkt. 52 at 11.) But parties need not disclose expert witnesses in their Rule 26(a)(1) disclosures. On the contrary, Rule 26(a)(1) requires a party to disclose individuals "likely to have discoverable information." Fed. R. Civ. P.26(a)(1)(A)(i). Defendant argues that Azevedo lacked discoverable information because he "was asked to perform certain specialized analyses of Long's damages spreadsheets and to provide expert opinions based thereon, all within the scope of Fed. R. Evid. 702." (Dkt. 56 at

13.) Azevedo was properly classified as an expert witness not subject to the initial disclosure requirement of Rule 26(a)(1).

Plaintiff argues finally that the Court should disregard Azevedo's Declaration "because it was submitted six days before the formal disclosure of his expert report." (Dkt. 52 at 11.) As Defendant correctly notes, however, Plaintiff's response "provides no legal or other authority for this position . . . [,] and it fails to explain what, if any, prejudice Long suffered as a result of the six-day difference." (Dkt. 56 at 13–14.) For these reasons, the Court will not disregard Azevedo's analysis and expert report, and the following sections of the Opinion track the categories of commissions detailed in Azevedo's report.

### B.    Unpaid Commissions for Fort Direct Sales.

There are two types of Direct Sales (products sold directly to end-users): sales that Plaintiff personally generated ("active sales"), and sales that were shipped into Plaintiff's territory but that Plaintiff did not help personally carry out ("passive sales"). (Dkt. 54 ¶ 30.) Both sides agree that, during the final years of Plaintiff's employment (but not initially), Plaintiff was entitled to commissions on all Simulaids Direct Sales, both active and passive. (*Id.*) At issue here, however, are Fort Direct Sales: Plaintiff asserts that his commission structure entitled him to commission on all Fort Direct Sales—that is, both active and passive sales. Defendant maintains that Plaintiff was entitled to commissions only on active sales that Plaintiff reported to his supervisor, Jack McNeff. (*Id.*) According to Plaintiff, the total commissions owed for passive Fort Direct Sales is $100,938. (*Id.* ¶ 72.)

Defendant relies on (1) the parties' course of performance throughout Plaintiff's employment; and (2) Plaintiff's admission in an email to McNeff that his commissions were limited to personally-procured sales to argue that Plaintiff is entitled only to commissions on active Fort Direct Sales. (Dkt. 43 at 12–15.) In opposition, Plaintiff argues that: (1) Plaintiff's understanding of his commission structure, (2) Plaintiff's limited access to available information, and (3) Defendant's internal procedures refute the argument that Plaintiff was not entitled to commission on Fort passive sales. (Dkt. 52 at 7–10.) Because no reasonable factfinder could conclude, based on the record evidence, that Plaintiff is entitled to commissions on passive Fort Direct Sales, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claim for $100,938 in unpaid commissions.

### i. Course of Performance.

Evidence concerning the parties' course of performance demonstrates that Plaintiff knew he had to report a sale, and his involvement in such sale, to receive commissions on a Fort Direct Sale. In other words, Plaintiff was only entitled to active sales commissions on Fort Direct Sales. Plaintiff testified, "I asked Jack McNeff how we're tracking [sales that were processed through Fort;] he informed me, well, I can't see it, I need you to send me the invoices." (Dkt. 44-1 at 77:18-78:6.) McNeff also emailed all territory managers as early as 2017 asking about sales receipts. (Dkt 44-1 at 47 ("Do any of you have sales I don't know about?").) In fact, Plaintiff does not dispute that "McNeff relied on Long to identify any [Fort] Direct Sales he procured."

(Dkt. 54 ¶ 43.) Plaintiff knew that, if he failed to notify McNeff about a Fort active sale, he would not receive commission credit:

> Q: Okay. You can put that one away, and we'll go to -- Well, let me just first generally ask. When you wanted to make sure you got credit for a [Fort] direct sale, you provided the documentation and backup for that direct sale to McNeff, correct?
> A: Correct.
>
> Q:Okay. And would you agree with me that there are repeated examples in the documents produced, in the e-mails between you and McNeff during your employment, where that happened, where he -- where you provided purchase orders to him or invoices as backup or he requested those from you and you got them to him? You know, that went on pretty much consistently throughout your employment at my client's. Would you agree with that?
> A: Yes.

(Dkt. 44-1 at 202:18-24; 203:1-9.) Not only was Plaintiff well aware of the requirement to report any active Fort Direct Sales, but he also consistently reported these sales. In one email addressed to McNeff, Plaintiff wrote, "[h]ere are copies of the invoices for orders that I *personally submitted* through [Fort] and did not get paid commission on." (Dkt. 44-1 at Exhibit K (emphasis added).)

This course of performance evidence also demonstrates that Plaintiff actively reviewed his commissions, yet never demanded commissions on the thousands of passive Fort sales made within his territory. (Dkt. 54 ¶ 55.) Plaintiff regularly received commission reports from McNeff that detailed all sales credited to Plaintiff. (*Id.* ¶ 41.) These reports allowed Plaintiff to review his commissions and raise any discrepancies he noticed. (*Id.*) In fact, as a self-identified "money-hawk," Plaintiff actively examined these reports and did not shy away from pointing out any errors he identified, and despite Plaintiff's insistence that he reported only sales that he

knew about based on the information available to him, these reports included all sales out of Fort beginning in 2019 or 2020. (Dkt. 44-1 at 78:10-12; 168:24; 169:1-3.)

Plaintiff could have used these commission and sales reports to create a list of all passive Fort Direct Sales and asked for commission on those sales, but Plaintiff identified only active Fort Direct Sales. (Dkt. 54 ¶¶ 63–64; Dkt. 44-1 at Exhibit J ("I have some [Fort] orders as well. For example, there are two orders . . . that I personally quoted, negotiated, and made sure were processed.").) But Plaintiff never demanded commissions on the thousands of passive Fort Direct Sales until after he resigned. (Dkt. 54 ¶¶ 54–55.)

Plaintiff states he "questioned" why he was not receiving commissions on these sales, to which the response was always "send me the invoices." (*Id.* at 55.) But in 2020, Plaintiff affirmed that the issues he raised with respect to his commissions were adequately resolved. (*Id.* ¶ 66.) Plaintiff disputes this statement, saying that he "affirmed the numbers in this specific situation . . . [,] but [I] was not satisfied as there were other unresolved issues that never got resolved." (*Id.*) There is no evidence, however, that Plaintiff raised his dissatisfaction with Defendant, which would have allowed Defendant the opportunity to accept or reject payment of such commissions. Accordingly, Plaintiff's claim that he should receive commissions on *all* Fort sales in his territory—both active *and passive*—is not supported by the parties' conduct during Plaintiff's employment.

ii.      **Passive Sales Commissions.**

Even more telling than the parties' course of performance is Plaintiff's email admission that he was not entitled to receive commission on all sales. (Dkt. 44-1 at Exhibit P.) During email discussions in January 2021 to finalize Plaintiff's commissions for the previous year, McNeff explicitly reminded Plaintiff that he would only receive credit for active sales. (*Id.* ("As you know you get credit for sales from [F]ort for what you brought in.").) Plaintiff's response was clear: "I want it all . . . just kidding. LOL." (*Id.*) Plaintiff saying "just kidding" strongly suggests that his request for "it all" (active and passive sales commissions) was something akin to a joke.

Plaintiff suggests that the email was a joke within itself. (Dkt. 44-1 at 201:16-20 ("I was joking from the tone so [McNeff] wouldn't think I was being disrespectful as a subordinate. But I definitely wanted the credit.").) But Plaintiff states in the following line of his email that: "We can go through to make sure things are credited properly on Monday." (*Id.* at Exhibit P.) Contrary to his stated concern with being disrespectful, Plaintiff was evidently not shy about demanding commissions. Even considering the evidence in the light most favorable to Plaintiff, no reasonable juror could find that Plaintiff was being demure in his request for "it all" merely out of a concern over workplace decorum.

In opposition to Defendant's motion, Plaintiff puts forth three arguments to support the claim that he was entitled to all Fort Direct Sales: (1) Plaintiff's understanding of his commission structure, (2) Plaintiff only reported sales that he knew about based on the information available to him, and (3) Defendant's internal

procedures refutes their arguments that Plaintiff was not entitled to commissions on all Direct Sales. (Dkt. 52 at 7–11.) As explained below, however, these arguments, when considered alongside Defendant's evidence, could not convince a reasonable factfinder that Plaintiff's commission structure entitled him to commissions on Fort passive sales.

### a. Plaintiff's Understanding of His Commission Structure

Plaintiff contends that he is entitled to commission on all Fort Direct Sales, both active and passive, because McNeff and other Simulaids and Fort employees told him that he would have a "protected sales territory." (*Id.* at 7.) Although there is sufficient evidence that Plaintiff had a protected sales territory, no evidence supports Plaintiff's definition of protected sales territory: that is, an entitlement to commission on all Fort Direct Sales, both active and passive.

Plaintiff claims he had discussions with McNeff prior to his employment in which McNeff assured Plaintiff that he would have a protected sales territory, such that any sale into Plaintiff's territory, whether active or passive, would be credited to Plaintiff. (Dkt. 57 ¶ 3.) McNeff's declaration does not support this statement. (Dkt. 57-1 at 2 ("Prior to Simulaids, Inc's hiring of Matthew Long in 2017 I interviewed Mr. Long on several occasions. I do not recall either Mr. Long or myself ever using the phrase 'protected territory' during these communications.").) Plaintiff also relies on the testimony of Angela Hoenig and James Rush Goodson, the two other territory managers, who confirmed McNeff told them that they had a protected sales territory. (Dkt. 57 ¶ 4). McNeff denies having this conversation with Hoenig or Goodson. (Dkt.

57-1 at 2.) Viewing the evidence in the light most favorable to the nonmoving party, there is sufficient evidence to assume these conversations took place despite McNeff's denials.

Whether Plaintiff's protected territory entitled him to passive Fort Direct Sales depends on if there was a meeting of the minds with respect to this term. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) (Under Illinois contract law, "there must be a meeting of the minds or mutual assent as to the terms of the contract.") Whether contractual parties had a "meeting of the minds" is determined by an objective theory of intent, not the actual subjective intent of the parties, such that intent is "defined by the objective manifestations in the contract's language and the parties' actions." *Bauer v. Qwest Commun. Co., LLC*, 743 F.3d 221 (7th Cir. 2014); *see also Sgouros*, 817 F.3d at 1034. Intent is thus not inclusive of any undisclosed or secret intentions of one party, nor does it involve purely subjective understandings of one party that the other party is unaware of. *Sgouros*, 817 F.3d at 1034.

Plaintiff claims "McNeff confirmed" the definition of a protected sales territory. (Dkt. 52 at 7.) But Plaintiff's citation points to his own testimony and definition of a protected sales territory. (*Id.* (citing Dkt. 53 ¶ 5).) In addition, although Plaintiff claims a protected territory is an industry standard, Plaintiff's testimony does not establish an industry standard meaning for the term, and Plaintiff did not adduce any expert testimony supporting this interpretation. (Dkt. 56 at 7 (citing *Alexander v. Take-Two Interactive Software, Inc.*, LEXIS 171979, at *3 (S.D. Ill. Sept. 22, 2022) (finding "opinions regarding industry standards . . . constitute expert opinions.")).)

14

As for Plaintiff's request for clarification of his commission structure, the cited evidence does not support Plaintiff's claims. Plaintiff contends that when he asked Kelly Jacobson, a Fort employee, for clarification on his commission structure, the response indicated "[he] was entitled to 2% on all 'direct sales of any item.' " (Dkt. 52 at 7.) But Jacobson's email was intended to communicate proper percentages applicable to various items, not to confirm Plaintiff's entitlement to commissions on all Fort Direct Sales. (Dkt. 44-1 at 75:11-16 ("Q: Okay. And around this time had you asked Ms. Dumner something about your commissions? Had you made an inquiry to her? A: Just an inquiry of do you know as far as the percentage on the Nasco items.").) Jacobson also specifically stated that "[a]ny sales you have going through Fort, keep a spreadsheet on and send it to me weekly. I don't want you losing any credit for sales that you bring in." (*Id.*) This email does not indicate that Plaintiff was to receive commission on all Fort Direct Sales.

Finally, Plaintiff presents no written communication or documentation mentioning a "protected territory." Any citation provided by Plaintiff only demonstrates his personal, subjective understanding that he had a protected territory. There is, therefore, insufficient evidence to show a genuine issue that Plaintiff and Defendant had a meeting of the minds with respect to the term protected territory. In the light of the evidence of the parties' course of performance, Plaintiff's understanding of his commission structure does not defeat Defendant's motion for summary judgment.

### b. Plaintiff Reported Only Sales That He Knew About Based On the Information Available to Him

Plaintiff contends that his inability to access comprehensive sales data prevented him from knowing that he was not receiving commission on all Fort Direct Sales. As such, Plaintiff could not have confirmed that Simulaids properly paid him. (Dkt. 52 at 8–9.) Plaintiff's assertions, however, are unsupported by the evidence of record.

In an attempt to argue that a material fact exists when a plaintiff is frustrated by a lack of information, Plaintiff cites to one case. (Dkt. 52 at 8 (citing *Bernstein v. Consolidated Foods Corp.,* 622 F. Supp. 1096 (N.D. Ill. 1984)).) *Bernstein*, however, dealt with a constructive discharge claim where defendants could not perform their job duties due to, among other reasons, a lack of sufficient information. 622 F. Supp. at 1098–1100. *Bernstein* does not allow for the conclusion that a material issue exists when a plaintiff lacks information such that "Nasco cannot argue that Long confirmed that he was properly paid commissions without Long having the data to support what he was owed." (Dkt. 52 at 8.)

Moreover, Plaintiff's statements, including that he did not receive all sales data needed to calculate his commissions, are unsupported by the facts; if anything, Plaintiff knew he was not receiving commission on all Fort Direct Sales. Plaintiff received monthly commission reports from McNeff which made clear Plaintiff was only receiving commissions on specific sales he procured and reported. (Dkt. 54 ¶ 54.) Plaintiff also admitted to receiving a comprehensive report, which he scrutinized meticulously, that included all sales within his territory. (*Id.* ¶¶ 60–64.) Plaintiff's

16

response, that he focused only on bonus figures and ignored other sales data, is contradicted by his own testimony, where he acknowledged reviewing the report in detail to identify additional sales on which he believed he was entitled to commissions. (*Id.* ¶¶ 61–62.)

Plaintiff asserts that, despite complaining to McNeff about missing commissions, he received no explanation or access to the data. (Dkt. 52 at 8.) Defendant presents evidence refuting this claim, and Plaintiff's contention that he never received access to QLIK reports, which tracked sales for both Simulaids and Fort, is contradicted by his own testimony (Dkt. 44-1 at 158:1-21). Plaintiff also affirmed the final commission total for 2020, conveying his agreement with the commissions paid. (Dkt. 54 ¶¶ 65–66; Dkt. 57 ¶ 24). Plaintiff's own admissions and actions refute his own argument that he could not confirm he was properly paid commissions due to a lack of having the supporting data.

### c. Defendant's Internal Procedures

Plaintiff argues that Defendant's internal return policy required any refund of a sale made into Plaintiff's territory, whether facilitated by Plaintiff or not, to be deducted from Plaintiff's commission total. (Dkt. 52 at 9.) If, under this policy, returns on passive sales must be deducted from his commissions, Plaintiff contends, then he must receive a commission on all such sales. (*Id.*)

Plaintiff's argument is not supported by the facts. McNeff's deposition testimony, which Plaintiff cites, states: "if the sales rep didn't get commission on the order, I would not charge [the return] back to them." (Dkt. 53-6 at 216:6-14.) This

contradicts Plaintiff's contention about Defendant's refund policy. Plaintiff rightly highlights that the evidence raises questions about Defendant's *other* internal procedures. (Dkt. 52 at 10.) Yet these questions do not concern Defendant's commission policy, and no reasonable juror could find that the information presented leads to the conclusion that Plaintiff was entitled to commission on all Fort Direct Sales.

Given Plaintiff's unsupported arguments and relying on the parties' course of performance and Plaintiff's email admission, the Court grants summary judgment for Defendant with respect to Plaintiff's claim that he was entitled to commissions on all Fort Direct Sales.

## C.    Sales to Dealers and Distributors.

Plaintiff and Defendant dispute whether Plaintiff's claim for $162,288 in dealer and distributor commissions should be categorized as Dealer and Distributor Sales or Dealer and Distributor Growth. Defendant argues Plaintiff's claim is for commissions on sales to dealers and distributors, and that Plaintiff's explicit testimony, that he was not entitled to such commissions, warrants the Court granting Defendant's motion for summary judgment. (Dkt. 54 ¶ 31 (" . . . I did not get credit for sales to distributors, because that's not part of the package.").) According to Plaintiff, this is a misrepresentation of his claim: "[t]he evidence in this case . . . is that Long is seeking any commissions for 2% growth on dealer and distributor sales." (Dkt. 52 at 6.)

Although Defendant does not dispute that Plaintiff was never paid 2% commission of growth of dealer and distributor sales, Defendant argues that Plaintiff is presenting a new claim that the Court must reject. (Dkt. 56 at 4 (citing *Grayson v. O'Neil*, 308 F.3d 808, 817 (7th Cir. 2002)) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").) To support their argument that "*[n]o portion* of Long's damage claims is based on the *growth* of sales," Defendant examines Azevedo's Declaration and Export Report in which Azevedo found Plaintiff is claiming "$162,359 in allegedly unpaid commissions on *Sales* to Distributors." (Dkt. 56 at 3 (emphasis added).) Yet Plaintiff testified that his commission structure entitled him to 2% on *Growth* of Dealer and Distributor sales. (Dkt. 44-1 at 139:1-18.) Based on that evidence, the Court declines to grant summary judgment based on Defendant's theory that Plaintiff is amending his complaint with new facts.

No matter how Plaintiff's claim to $162,288 is categorized, however, it remains flawed. Plaintiff provides no evidence to support his contention that he was entitled to commissions on 2% growth of dealer and distributor sales. In asserting that his commission structure entitled him to 2% growth, Plaintiff cites to his own testimony. In fact, the cited testimony states, "[m]y complaint is focusing on the 4 percent on Alex, the Smart Stat products, and the 2 percent of direct sales on any other item, *not the distributor sales*." (Dkt. 53-1 at 97:6-10 (emphasis added).) No reasonable juror could find that Plaintiff's commission structure entitled him to the $162,288 that he

is claiming, and the Court thus grants summary judgment for Defendant with respect to this claim.

### D. Sales to Distributors and International, OEM, and Intercompany Sales.

Apart from Plaintiff's claimed damages of $162,288 on Sales to Distributors, Plaintiff is also claiming unpaid commissions of $18,969 on Sales to Distributors and International, Original Equipment Manufacturer (OEM), and Intercompany Sales. (Dkt. 54 ¶ 72.) Defendant argues they are entitled to summary judgment with respect to this claim because Plaintiff testified that he is not entitled to commission on any such sale. (Dkt. 56 at 2).

As Defendant highlights, "[c]ourts regularly grant summary judgment based on admissions made by the non-movant in their depositions." (Dkt. 43 at 10 (citing *Burns v. Vill. Of Crestwood*, WL 946654, at *5–6 (N.D. Ill. Mar. 14, 2016)).) Plaintiff stated, "[p]aragraph 11 [of the Complaint] lays out the territory that I have." (*Id.* at 11.) Plaintiff's territory included several Midwestern states but mentions no territory related to International, OEM, or Intercompany Sales. (Dkt. 44 at 5–6.) Plaintiff clearly stated that territory managers did not sell OEM products:

> Q: "Okay. So when Simulaids sold a Simulaids product to an OEM, you've testified that you had no expectation of being -- receiving a commission for that sale?"
> A: "Yes. An OEM is something like the punching -- the boxing dummies. That's something we don't even sell for us, the salespeople in our position. They had a whole other branch of stuff that they sold that we had nothing as a part of. That's OEM."

(Dkt. 44-1 at 61:16-24.) This evidence shows that Plaintiff did not expect to receive commissions on OEM products, and nowhere does Plaintiff provide evidence that he was entitled to International or Intercompany Sales. As a result, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claim for $162,288 in unpaid commissions on Sales to Distributors and International, OEM, and Intercompany Sales.

### E. Simulaids Direct Sales.

Plaintiff claims Defendant owes him $13,296 in unpaid commissions on certain Simulaids Direct Sales. (Dkt. 54 ¶ 72.) Defendant argues they are entitled to summary judgment with respect to this claim because "there is no record evidence that Simulaids failed to compensate [Long] for these sales." (Dkt. 43 at 15.) Plaintiff argues he is entitled to unpaid commission on certain Simulaids Direct Sales because he "may have had other 'big ticket items' ordered through Wisconsin," but he was never given a complete report of these sales. (Dkt. 52 at 10.) Relying on this statement alone, Plaintiff argues that "[t]his is a question of fact as to the amount of these sales, where they came from, and the amount of each one." (*Id.* at 11.) Defendant contends that their motion for summary judgment should be granted because Plaintiff produced no evidence of Simulaids Direct Sales on which he was not paid a commission.[1] (Dkt. 56 at 11 (citing *Grant v. Trs. Of Ind. Univ.*, 890 F.3d 562, 568 (7th

---

[1] Defendant also argues that Plaintiff's claim for unpaid commissions for certain Simulaids Direct Sales fails because "Simulaids Direct Sales are by definition processed through New York, not Wisconsin, and so the potential for other "big ticket items" ordered through [Fort] is irrelevant." (*Id.*) Plaintiff's testimony, however, indicates that items may be ordered from Wisconsin but processed through New York. (Dkt. 44-1 at 195:17-24; 196:1-5.)

Cir. 2017) ("[S]ummary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.").) As the non-moving party, Plaintiff "may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; [he] must go beyond the pleadings and support [his] contentions with proper documentary evidence." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (quoting *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001)).

Plaintiff produced no evidence related to these "big ticket items," and "[i]f Long had evidence of Simulaids Direct Sales on which he was not paid a commission, he should have raised it in the Response." (Dkt. 56 at 11.) Because Plaintiff does not produce any "specific, admissible evidence," the Court grants summary judgment for Defendant with respect to the allegedly unpaid commissions on Simulaids Direct Sales.

### F.    Unpaid Bonuses.

Plaintiff argues he "was entitled to bonuses based on his growth based on all sales made into his territory." (Dkt. 52 at 11.) It is undisputed that, under Defendant's 2017 Commission Plan, which was in effect until 2021, a territory manager was eligible for bonuses, with a potential of $25,000 per year, if they sold a certain number of High-Fidelity Mannikins. (Dkt. 54 ¶¶ 39–40.) Plaintiff contends that if he was credited with all Fort Direct Sales, including passive sales, he would have been eligible for these bonuses. (Dkt. 52 at 11.) Because the Court is granting summary

judgment for Defendant with respect to Plaintiff's claim on commission to passive Fort Direct Sales, Plaintiff's claim for unpaid bonuses must fail.

## IV.    CONCLUSION

Defendant's Motion for Summary Judgment (Dkt. 42) is granted.

SO ORDERED in 21-cv-02320.

Date: March 30, 2024                    _____

                                        JOHN F. KNESS
                                        United States District Judge

23